## SALOMON v. WEBSTER.

1. A contract cannot arise unless the proposition made by one is accepted by the other without any modification whatever.

2. Where in view of the whole evidence the verdict is palpably unwarranted, the verdict will be set aside.

3. To instruct a jury that "if they believe," (omitting to add "from the evidence") is objectionable.

*Error to County Court of Arapahoe County.*

ON the trial of this cause Ralph C. Webster, being duly sworn, testified : "My name is Ralph C. Webster, I am the plaintiff in this suit, and am acquainted with the defendant Salomon. Either in September or October, 1867, the defendant called on me and asked me to take charge of a claim which he had against the United States for corn delivered at Camp Filmore, on the Arkansas river, a little below Pueblo. The conversation was at his store in Denver. He explained the case to me, and said that certain action had been taken, and the claim rejected. Upon his representation of the claim I thought it could be collected. He told me if I collected it he would give me $1,000. He gave me the papers and memoranda relating to it, and within a few days I started to Washington. I got the claim referred to the inspector-general of the army, General Hardee, who reported it back adversely. I then got additional testimony in New York, and brought it before the board of claims, then sitting in Washington; the board decided it adversely."

Counsel for the plaintiff asked the witness the following question : "Did you employ counsel to assist you in pre-

senting the defendant's claim, and if so, upon what terms?"
The defendant by his counsel objected; for the reason that
the witness had shown no authority from defendant to
employ counsel at his expense; but the court overruled the
objection and permitted the witness to answer the question,
which he did, as follows: "I employed F. J. D. Fuller as
my attorney to carry the claim through the United States
supreme court, on appeal from the board of claims." To
which ruling and decision of the court in permitting this
question to be asked and answered, the defendant by his
counsel then and there excepted.

Thereupon the witness further testified: "The defendant
did not know of my employing Mr. Fuller by name, but
knew I had employed an attorney, and that the attorney
was to have $1,000 if he collected the claim. After I had
been two or three months at Washington I wrote to Salomon
that his claim was more than he reported it, that I would
have to employ an attorney and pay him $1,000; that I had
been to considerable expense, and wanted him to give me
$500 to re-imburse me for that expense. I stated to him also
that it would leave him $2,616.20 after deducting $1,000 to
Fuller and $500 to me, less some small expenses for taking
two or three depositions. After writing this letter, and at
the same time, I gave Mr. Fuller a power of attorney con-
taining a power of substitution, to prosecute the case in the
court of claims and supreme court."

Witness here handed a letter which is marked B by the
court, and he resumed: "This is a letter received by me
from the defendant in reply to a letter written by me to Sal-
omon. I went to Denver in the fall of 1869, met Salomon at
his store and asked him if he had heard from the claim, as
I was anxious to get my $500, and that $500 wouldn't pay
my actual expenses, not including my trouble. He offered
to sell the claim to me for $2,000. Mr. Salomon never said
any thing about my $500 charge until after he got his claim
collected. He then called me into his store and showed
me his bill of expenses for over $400 in addition to Mr.

Fuller's charge of $1,000, and told me it would not leave me over $30, $40, or $50; I told him I had nothing to do with expenses, and he asked me to show him my paper to that effect; I showed him this letter 'B' and called his attention to his offer to take $2,616.20 in full for his claim, and he replied that he did not know why he expressed himself in that way, and admitted that I never wrote him any such a proposition; Salomon has never paid me any thing, but offered to pay my account with Salomon Bros. of some $69 to settle the matter; Salomon got from Fuller over $3,000, some time in February or March, 1874." Letter " B "was then offered in evidence. To the introduction and reading of which in evidence, the defendant by his counsel objected, for the reason that it was immaterial, and contained no evidence of an agreement by the defendant to pay an additional $500 to the plaintiff for his services, and because it showed a counter proposition, not accepted by plaintiff, etc., but the court overruled the objection and permitted the letter to be read in evidence. The letter was read to the jury as follows:

DENVER, COL., *Nov.* 17, 1867.

COL. R. C. WEBSTER, DEADHAM.

Dear Sir — In reply to your favor of the 8th instant, I inclose you several indorsements which I presume will be sufficient. In regard to the moving of Camp Filmore, and the delivery of the corn, I cannot get any affidavits as all the parties military and civil, who were connected, left the Territory. In regard to the 25 per cent commission, I think it is very steep. When I offered you $1,000 I took it for granted you would have to pay something for influence, etc., and that you would not retain the full amount for your services. . It is a great loss to me and I hate like the d—l to lose so much; but if you cannot do any better I will take the amount you offer, to wit, $2,616.20 in full for my claim, and as you have full power of attorney, settle the d—d thing. If you succeed in settling and get the

money, place above amount to the credit of First National
Bank of Denver, with Fourth National Bank of New York,
and inform me by telegram as well as letter. Hoping soon
to receive news of settlement, and wishing you a pleasant
time, I am          .          Yours Truly,

                                        FRED Z. SALOMON.

P. S.   Make inquiries what steps would be necessary to
get pay from the government for property destroyed by the
red devils. There are many claims of that kind in this
country, and if you had the inside track, it may be a good
thing for you to take hold of them.

                                        F. Z. S."

On cross-examination this witness testified: · " I placed
the claim in Fuller's hands in 1869, more than a year after
I wrote the letter to which ' B ' is an answer; I never paid
Fuller any money for the suit;. I received letter ' B ' prior
to placing the claim in Fuller's hands; I was to have
·$1,000 if I collected the claim, and nothing if I did not col-
lect it; I had some correspondence with Salomon before.
placing claim with Fuller; wrote him first that I must have
50 per cent if collected, as I would have to pay an attorney
$1,000, and must have an allowance for my expenses; I
made the contract with Fuller to collect the claim for $1,000,
Salomon to pay the expenses; my power of attorney from
Salomon only authorized me to collect the debt; I returned
to Colorado in the fall of 1869, and at several times fater
my return, I inquired after the claim of Salomon and told
him I was anxious about my $500, and he never objected
to my claim for the $500, until after the claim was paid; he
then called me into the store and informed me that it was
allowed and showed me his bill of expenses; I don't think
I ever accepted Salomon's proposition to take the $2,616.20
contained in letter ' B '; my letter to Salomon asking for
an additional fee of $500, and this letter ' B,' which is the
answer to it, represents the status of affairs between me and
Salomon when I returned from Washington to Colorado. I

may have said in my letter to Salomon, that 'it would leave him $2,616.20, less expenses,' but I meant that he was to pay the expenses. When Salomon showed me this bill of expenses he said it would not leave much coming to me, not more than $30 or $40. I told him I was to have $500, and had nothing to do with expenses; but Mr. Salomon claims that the agreement was that he was to have $2,616.20 for his claim and was to bear none of the expenses, and so the matter stands."

Thereupon the plaintiff rested his cause.

The defendant was then sworn in his own behalf, and testified as follows:

"My name is Frederick Z. Salomon, and I am acquainted with the plaintiff since 1867, and am the defendant in this cause. Mr. Webster was going to Washington in 1867 on other business, and knowing he was an old army officer, and thinking he might have influence enough in army quarters in Washington to collect this claim, I showed it to him and explained it, and told him if he would collect it I would give him $1,000, but that I would not go to any more expense about it, and would pay nothing if he did not succeed in collecting it. He accepted my offer, and took the papers and memoranda concerning the claim with him. I got several letters from him about the claim, and this letter 'B' is my answer to one of them. After the claim was settled, I paid no more attention to those letters, and they have been lost or burnt up. The substance of Mr. Webster's letter to which 'B' is a reply, was that he could do nothing with the claim, and had put it in the hands of an attorney; that he had been to some expense and wanted me to allow him more money. I was unwilling to make that kind of an arrangement and wrote Col. Webster this letter 'B,' in which I make him a proposition to take $2,616.20 net, in full for claim, leaving him all he could get over that amount, but he never answered this letter. Afterward I got a letter from Mr. Fuller, attorney in Washington, saying Webster had left the claim in his hands for

collection, and requesting me to send him money to pay costs of taking an appeal, affidavits, depositions and such things ; I then took it for granted that Webster had abandoned the claim and from that time I corresponded only with Fuller. After the claim was allowed, I had a conversation with Webster in my store, in which I told him I had got a letter from Fuller saying the claim was allowed, and then showed him a list of expenses incurred by me in prosecuting it, amounting to some $460 ; he then demanded $500 of me for his services; I told him I never agreed to pay him $500 ; that our agreement was that he was to have $1,000 if he collected it, and nothing if he did not ; and was to pay his own expenses ; but was willing to settle with him according to my letters or any agreement he could show me ; he then showed me this letter 'B' and I told him I was willing to settle by that, although he had never replied to it, but that it would leave little or nothing coming to him ; Mr. Webster refused to settle by this letter ; my claim was allowed for $4,116.20, and after paying Fuller $1,000 and costs, $460, it left a balance for me of $2,656.20, which, on the basis of my letter 'B,' would leave just $40 coming to Webster ; in order to settle the matter and prevent trouble I also offered in addition to give him the amount of his book account with us, then amounting to about $70 ; he would not settle in that way, and so we parted ; Mr. Webster never alluded to this claim for $500 in any previous conversation, and I never knew he intended to prefer such a claim against me, until he made the demand himself as I stated ; I never agreed to pay him $500 or any other additional sum to my first agreement with him, for $1,000 ; and I never varied or attempted to vary that original agreement, except as stated in my letter 'B,' which Col. Webster never accepted ; Webster never did any thing to collect the claim and never went to any expense about it that I know of ; Mr. Fuller did all the work and I furnished the money needed to collect it ; at the time of that conversation in my store, I did not owe Mr. Webster any thing,

and I do not to-day.   He owes me still that book account of $70.''

On cross-examination the witness testified as follows:

"I gave Webster a power of attorney and he wrote me that he had employed Fuller to prosecute the claim for $1,000 ; I made him no reply to this at the time, as I did not care how I got my claim collected ; I never authorized him to employ an attorney ; the only authority I gave him was in that power of attorney ; I did  not care who he employed to collect it or assist him ; Webster never said any thing to me about this $500 until the claim was paid, and I never even suggested to him that I would give him $500 ; I got $40 more than the $2,616.20 mentioned in letter 'B;' I never said Webster would be entitled to $500 when the claim was collected.''

The foregoing was all the evidence introduced.

Messrs. CHARLES & DILLON, for plaintiff in error.

Messrs. WELLS, SMITH & MACON, for defendant in error.

THATCHER, C. J.   This is an·action in assumpsit.   The declaration contains only the consolidated common counts. Salomon  had a claim against the United States for corn delivered at Camp Filmore, on the Arkansas river.   The amount of the claim was $4,116.20.   In October, A. D. 1867, Webster, a few days before he started for Washington, on business of his own, agreed with Salomon to undertake the collection of the claim.   In the event of success, Salomon  was to pay him $1,000, otherwise he did  not agree to pay him any thing for his services.   The claim was presented by Webster before the court of claims, in Washington, and rejected.    There is no pretense that Webster ever performed or was entitled to any compensation under the original contract.   Upon this point counsel are agreed.

Plaintiff, however, asserts that the contract originally made, and as to whose terms the parties are in accord, was afterward abandoned and another contract substituted,

upon which he sues. Having failed to collect the claim, under the original contract, and desirous of entering into a new agreement with Salomon for the further prosecution of the claim, Webster wrote a letter to Salomon, from Washington, in which he made a new proposition. Oral evidence of the contents of the letter was received, for the reason that the original had been lost. Webster, by this letter, informed Salomon that it would be necessary to employ an attorney for a contingent fee of $1,000, to prosecute the appeal to the supreme court of the United States; that he (W.) had been to considerable expense; that he (W.) wanted Salomon to pay him $500; that if he acceded to his request, it would leave him (S.) $2,616.20, less some small expenses. In answer to this letter, Salomon wrote Webster as follows:

"DENVER, COL., Nov. 17, 1867.

Col. R. C. WEBSTER, DEADHAM:

Dear Sir—  *  *  *  In regard to the 25 per cent commission, I think it is very steep. When I offered you $1,000, I took it for granted you would have to pay something for influence, etc., and that you would not retain the full amount for your services. It is a great loss to me, and I hate like the d——l to lose so much; but if you cannot do any better, I will take the amount you offer, to wit: $2,616.20, in full for my claim.  *  *  *  If you succeed in settling and get the money, *place above amount* to the credit of First National Bank of Denver, with Fourth National Bank of New York, and inform me by telegram as well as letter. Hoping soon to receive news of settlement, and wishing you a pleasant time, I am

Yours, truly,

FRED. Z. SALOMON."

It will be observed that Salomon did not yield to the terms of the proposition submitted to him by Webster so far as related to the payment of any expenses whatsoever.

By necessary implication, so much of Webster's proposition as concerns expenses, is repudiated, and he submits instead, a counter proposition. It is clearly apparent from Salomon's letter, that by reason of the difficulty attending the collection of the claim, he was willing to accept from Webster $2,616.20, in full payment of his claim. This exact sum was to be paid into the bank for credit, as directed. The proposition is, we think, free from ambiguity. The amount to be paid Salomon was *net*, exclusive of all expenses incident to the collection. Instead of accepting the identical offer made to him, he modifies it, and re-submits it to Webster, with such modification. This letter did not, therefore, of itself, conclude an agreement. Upon this point the law is clear. Unless the proposition made by one is accepted by the other, *without any modification whatever*, no contract arises. In such case there is no concurrence of parties.

"If the acceptance modifies the proposition in any particular, it amounts to nothing more than a counter proposition. It is not in law an acceptance which will complete the contract." *Jenness* v. *Mount Hope Ins. Co.*, 53 Me. 23 ; *Beckwith* v. *Cheever*, 21 N. H. 41.

There was no further correspondence between the parties. If any contract was concluded, it must have resulted from the acceptance of Salomon's counter proposition. There is some evidence tending to show such acceptance. F. J. D. Fuller was employed by Webster to prosecute the claim before the supreme court. The agreed contingent fee was $1,000. Fuller wrote to Salomon in relation to it, and from that time forth until the claim was finally collected, all correspondence was carried on between Fuller and Salomon. When due, the fee of $1,000 was paid by Salomon to Fuller, thus ratifying his employment by Webster. Webster had nothing whatever to do with the collection after he employed Fuller, and whether this employment preceded or followed the receipt of Salomon's counter proposition does not very satisfactorily appear, nor is it very material. When the

claim was collected Salomon paid $1,000 *o* Fuller, and offered to pay Webster a sum which with actual expenses incurred amounted to $500. If accepted by Webster the net balance in Salomon's hands would have been $2,616.20, the precise sum he agreed to take in satisfaction of his claim. As the expenses incurred were $460, the balance due Webster was but $40. Webster, however, insisted that he was entitled to $500 net in virtue of the substituted contract under which, having failed himself to make the collection, he put the claim in Fuller's hands, and gave no further attention to the matter. There is certainly nothing in the correspondence between Salomon and Webster that even remotely supports his (W.'s) claim for $500 net. By the verdict of the jury, however, he was allowed the $500, and interest, $112.50; total, $612.50. We are at a loss to know upon what evidence this verdict rests, clearly not upon the correspondence which Webster testifies "represented the status of affairs between him and Salomon when he (W.) returned from Washington to Colorado."

Thus far it will be seen that the parties substantially agree in the material testimony. Upon one point, however, they are in direct conflict. In A. D. 1869, before the claim was collected, Webster testifies that he met Salomon in his store in Denver and asked him if he had heard from the claim, as he was anxious to get his $500. Salomon was silent as to his demand. From this circumstance, defendant in error seeks to draw the inference that Salomon admitted by his reticence that when the claim should be collected, he (S.) would owe Webster $500 net. This, to say the least, is an exceedingly remote deduction, wholly at variance with any just inference to be drawn from the correspondence and acts of the parties. Besides, Salomon flatly contradicts Webster in regard to this alleged conversation, and declares that it never occurred. In view of the whole evidence, the verdict is so palpably unwarranted that we cannot permit it to stand. At first blush it is apparent that the jury attached undue significance to the alleged conversation in

Salomon's store, and overlooked much material and uncontradicted evidence adduced at the trial.

In our opinion the court did not err in admitting in evidence Salomon's letter to Webster. It was a link in the chain of testimony, without which a contract between the parties could not have been established. Whether the proposition contained in that letter was accepted by Webster, could only be determined by the jury in the light of the subsequent events to which we have alluded.

The court *inter alia* instructed the jury as follows :

" If the jury *believe* that this contract was subsequently changed by the parties," etc.

To this form of instruction plaintiff in error objects on the ground that the jury are not thereby required to predicate their belief on the evidence. It is claimed that the jury might fairly conclude from this instruction that they were at liberty to make up their verdict upon supposed facts within their knowledge, whether in evidence or not. This form of instruction is objectionable, and in a case where the evidence is quite evenly balanced, *might* be a ground of reversal.

In *Ewing* v. *Runkle,* 20 Ill. 464, the doctrine is laid down that juries should be permitted to believe nothing not based on the evidence, and that their minds should always be directed to that and to that alone, as the ground of their belief. The judgment, however, in this case will be reversed on the ground that the verdict is unsupported by evidence.

Dissenting opinion of STONE, J. This was an action by defendant in error, Webster, to recover for alleged services in the collection of a claim of plaintiff in error, Salomon, against the United States. It was agreed that if the claim was collected Webster was to receive $1,000 for his services. The claim having been rejected by the tribunal before which it was first prosecuted, it became necessary to employ

an attorney to carry the case into the supreme court, and such attorney was employed by Webster for a contingent fee of $1,000. Webster claimed that to meet this altered state of the case not originally contemplated, a new agreement was made, whereby Salomon agreed to pay him the sum of $500 for his services, in addition to the $1,000 to be paid the attorney. The claim was finally allowed by judgment of the supreme court, the plaintiff received the sum so allowed, amounting to $4,116.20. Salomon paid the agreed fee of $1,000, to the Washington attorney, and also paid, according to his own showing, something over $400 for various expenses in the prosecution of the suit, and upon his refusal to pay the sum of $500 demanded by Webster, this suit was brought to recover, and a judgment for that amount with interest was rendered in the court below, from which Salomon prosecutes his writ of error.

The first error assigned is upon allowing the following question to be put to the defendant in error as a witness: "Did you employ counsel to assist you in prosecuting the defendant's claim, and if so, upon what terms?" This question was objected to for the reason "that the witness had shown no authority from defendant to employ counsel at his expense." I think this question was not objectionable upon the reason assigned. The witness, certainly, was at liberty to employ counsel at his own expense; and if employed at the expense of the plaintiff in error, then the want of previous authority from the plaintiff was not material, provided it was shown that he subsequently sanctioned and ratified such employment.

The defendant in error sought to recover, not upon the original contract, but upon a subsequent agreement. It is conceded that the original contract was not carried out by either party, and it is not denied that an attorney was employed who was paid by the plaintiff in error. The employment of such counsel was, therefore, a fact or circumstance, which, if proved, would tend to establish the making of a subsequent agreement, and as such subsequent

agreement was the main fact sought to be proved, as that upon which the right of recovery was based, this is an additional reason for holding that the question was not improper.

The second error assigned is upon the admission as evidence, of the certain letter marked "B," written by Salomon to Webster. Such portion of this letter as is considered material, is set out in the opinion of the chief justice. The competency of this letter as evidence is questioned by counsel for plaintiff in error, on the alleged ground that it contains no evidence of an agreement by Salomon to pay an additional $500 to Webster for his services, and because it shows a counter proposition which was never accepted by Webster.

Standing alone, the letter at least shows that Salomon was then willing to 'assent to a new agreement different from the first in respect to the amount to be paid for collecting the claim. The sum of $2,616.20, which he states in the letter he is willing to accept in full of his claim, is $1,500 less than the full amount of the claim. The letter, therefore, expresses a willingness on the part of Salomon to pay $500 at least in addition to the amount originally agreed to be paid for collecting the claim.

The chief point in issue seems to be whether the $1,500 here proposed to be paid for services was to cover also all expenses, or whether by any agreement whatever Salomon was to settle the expenses in addition to the amount to be paid for services. The evidence offered in support of the alleged agreement to pay Webster $500 for his services in addition to the $1,000 paid to the attorney, was the testimony of Webster himself, together with Salomon's letter and the conduct of the parties respecting the transaction. Salomon in his testimony denied the making of any agreement on his part to pay to Webster the sum of $500, or any other sum, in addition to the $1,000 first agreed upon, or that he ever attempted to vary the original agreement except as stated in the letter "B," and which Webster never ac-

cepted ; Salomon admitting, however, that after the claim was collected, he expressed to Webster a willingness to settle according to the terms of said letter. Webster testified that the letter "B" was in answer to one he wrote stating the necessity for employing an attorney at a fee of $1,000, and demanding that $500 should be paid him, Webster, for his own services and expenses incurred, and adding that it would leave Salomon the sum of $2,616.20 "less expenses."

Considering the nature of the case, and the character of the evidence, we are agreed, that as one of the links in the chain of evidence tending to show what agreement, if any, was made subsequent to the original one and acted upon afterward, the letter was admissible.

The other errors assigned are based upon the instructions given and refused by the court below. I think the instructions given set the case fairly before the jury and are correctly stated. The one instruction refused was given with a modification by the court, which in my opinion was very properly added.

As to the instruction commencing : "If the jury believe that this contract," etc., I concede that if instead of the usual *formula*, "If the jury believe, from the evidence," the words "from the evidence" were omitted in each and all the instructions given in a case, it would be certainly objectionable, and might be ground for reversal ; but where there is a series of instructions, as in this case (where there are ten) the omission of the words in question from one single instruction in the series certainly could not mislead the most ignorant and perverse jury to suppose that they were at liberty to form a belief outside of the evidence in the case, when by every other instruction they were expressly directed to found their belief upon such evidence.

This case has been twice tried in the court below, resulting in a like verdict for defendant in error by the jury in each trial. A question is raised by counsel for defendant in error, whether, under section 24 of the Practice Act, R. S.,

p. 508, another trial of this case can be had ; and it is contended that the language, "if either party may wish to except to the verdict, or for other causes, move for a new trial, or in arrest of judgment, he shall give notice, etc., etc., *but no more than two trials shall be granted to the same party in the same case,*" * * * is to be construed as a limitation upon the number of trials that may be had in any one case, and hence, there having been two trials of this case, no other one can be allowed. I think such a construction would fail to give to the language employed its true meaning and intent. The section relates *inter alia* to the granting of *new* trials, and, after prescribing the requisites of a motion for each new trial, the language follows, that "no more than two trials shall be granted," etc. I think the word "granted" must be taken in a restrictive sense, as limiting the number of trials to be allowed by the *nisi prius* court upon motion for a *new* trial in the same case, and is not to be taken as a limitation upon the allowance of a new trial by the supreme court for error in the court below.

The only evidence in the case is the testimony of the parties, plaintiff and the defendant, together with the letter "B," referred to. This, together with the conduct of the parties, make up the case. The plaintiff below failed to make out a clear and complete case upon any express contract or promise of Salomon to pay the amount sued for ; but from all the evidence, I think it was possible for the jury to have found, as they evidently did, that such a contract was fairly implied. The jury, who are judges of the credibility of the witnesses respectively, as well as the weight to be attached to each portion of the testimony, not unfrequently form an opinion from putting together a large number of mere grains of evidence, gathered from all the circumstances entering into a case, and giving complexion to the whole mass, and it is a matter of no small responsibility for an appellate court, who have not heard the testimony as given in the court below, nor seen the air and

manner of the witnesses on the trial, to assume to say, that upon the testimony alone, the verdict is unwarranted, unless, from the patent want of evidence on one side or the other, the unbiased judicial mind is shocked by the verdict at first blush.

If we concede that the jury refused credence to Salomon's denial of the statements of Webster in the case ; if they believed that Webster's repeated demand of the $500, claimed for his services, was met by such silence on the part of Salomon as to imply a tacit assent to the claim, if they refused to believe that the rather remarkable sum of nearly $500 outside the attorney's fee of $1,000 was required to be expended.in hearing the case on appeal; or if upon other like hypothesis which their belief from the evidence warranted them in assuming, it is not difficult to · reconcile the verdict with the whole evidence in the case.

A mere preponderance of the testimony against the verdict, will not warrant its disturbance, if there is any evidence upon which the verdict might not unreasonably have been found. This is too well settled to require a citation of the authorities here.

The testimony of the two parties respecting the alleged agreement upon which recovery was sought seems to me to be in direct conflict. The rule, as laid down repeatedly by this court, in such cases is, that the verdict of the jury who are to determine the credibility of the witnesses, as well as the weight and preponderance of the evidence, will not be disturbed. *Barker* v. *Hawley*, 4 Col., and cases there cited.

For these reasons I dissent from the opinion of the majority of the court, that upon the evidence alone the case should be reversed. I think the judgment of the court below should be affirmed.

*Reversed.*