Morgan, J.
This is an appeal from a judgment against the plaintiffs in an action for the specific performance of a contract. The judgment should be affirmed.
The plaintiffs sued for the specific performance of a contract made in September, 1909, in substance as follows : Monte Yista, Colorado, ........, 19.. Sec. 17, Tp. 38, R. 9, Conejos county. Title stands in name of Concord Land & Improvement Co. Number of acres, 640. Lowest net price $25 (per acre). Terms of sale, one-half cash, balance one to two years. Lowest amount to bind the bargain $500. That defendant agrees to furnish abstract and make a warranty deed to plaintiffs or to whom they may direct; that defendant places the land in plaintiffs ’ hands, they to negotiate a sale so as to net defendant the price stated above, for which defendant agrees to allow all above said net price as a commission when a sale is effected; property to be left in plaintiffs’ hands and contract to remain in full force until plaintiffs should receive notice that the property is withdrawn from the market, and, upon receipt of such notice by plaintiffs, the. contract to become null and void and both parties released from further obligations. Plaintiffs pledge themselves to use their best efforts, at their own expense, to dispose of the land. Signed by defendant only. The complaint also contains allegations of a subsequent parol modification hereinafter referred to.
This contract is more in the nature of an employment of the plaintiffs, as agents, to sell the land for a commission, than a contract for the sale thereof. There is noth *399 ing in tlie contract that would tend to make it a contract of sale, except that defendant agrees to make a warranty deed to plaintiffs or to whom they may direct. This provision is in harmony with a contract of employment, and does not convert it into a contract for the sale of land, and the alleged modifications do not materially assist in such conversion.
It is not such a contract for the sale of land as would admit of a suit for specific performance thereof.
‘ ‘ The specific performance of a contract is its actual execution according to its stipulations and terms; and is contrasted with damages or' compensation for the non-execution of the contract. Such actual execution is enforced, under the equitable jurisdiction vested in the courts, by directing the party in default to do the very thing which he contracts to do.” — Fry on Specific Performance, sec. 3.
Courts of equity have been slow to enforce specific performance, in face of the right to sue at common law for damages for the breach of a contract.
This contract is without date or consideration, uncertain and indefinite as to the purchaser, and as to the time and security of the balance of the purchase price; the plaintiffs do not agree to buy and the defendant does not specifically agree to sell; the names, the price and terms upon which the plaintiffs might sell it, ,as agents of the defendant, alone are given, with the possible susceptible interpretation that plaintiffs could accept the proposal therein contained, and buy it themselves.
Waterman on Specific Performance of Contracts says, in sec. 152:
“Considerations as to the certainty of a contract sought to be enforced arise in a suit for specific performance which do not present themselves in an action at law for damages occasioned by a breach.”
“Sec. 157. If the language of the contract is con *400 tradictory, or there are two different agreements in relation to the same subject matter, specific performance will in general be refused. ’ ’
“Sec. 186. Contracts which are voluntary, or where there is no consideration on the part of him who seeks performance, will not be specifically enforced, although under seal, whether the contract be in the form of an agreement, a covenant, or a settlement. ’ ’
It has been held by our supreme court that a contract of this character must be based upon a consideration before an action can be maintained thereupon for a specific performance thereof. — Rude v. Levy, 43 Colo., 482, 487, 96 Pac., 560, 127 Am. St., 123; Winter v. Goebner, 2 Colo. App., 259, 261, 30 Pac., 51.
In Rude v. Levy, supra, the court said:
“The writing upon which this action for specific performance is based was not signed by plaintiff and did not at its execution possess the elements of a binding contract. It was, on the contrary, as named by the parties themselves, a mere ‘option to purchase.’ According to its terms there was nothing obligatory upon plaintiff, unless, at a future time, he elected to accept and perform. And even after such election, the only penalty for nonperformance would be a forfeiture of the money, if any, previously paid. Moreover, there was practically no consideration for the option. The recital of $1 as paid is the usual provision inserted in such instruments as a matter of form, and even if this sum were actually advanced, it would be merely nominal. It would not, alone, constitute the ‘proper’ or ‘fair’ consideration usually considered essential to a suit for specific performance.”
Also Pomeroy on Specific Performance, sec. 57, p. 79.
Assuming, but not admitting, that this brings this contract within that species referred to by Mr. Pomeroy, supra, in the following excerpt from sec. 169, p. 235—
“Among the examples of this species are those con *401 tracts by which the party, upon whom alone an obligation arising from the express stipulations rests, covenants or promises to do or to forbear from some specified act upon the request of the other, and those by which the party making an offer, covenants or promises to do or to omit some act upon the assent or acceptance of the person to whom the offer is addressed, and those in which the party confers an option upon the other; ’ ’ — •
nevertheless, the assent or acceptance in this case was not an assent, to, or an acceptance of, the terms of the contract as originally written or the alleged modification.
Plaintiff sent a telegram to defendant, and a letter confirming it, accepting the offer contained in the contract as modified. The telegram was as follows:
“Tour terms on trade of Section Seventeen accepted. Send abstracts. ”
The letter confirming the telegram says:
“We wired you yesterday that ‘your terms on trade of section seventeen accepted. Send abstracts.’ We understand that your terms to be that we are to take the entire section seventeen at $27 per acre, net to you; that you will accept the 172 acres of Arkansas timber land at -$30 per acre, providing the abstracts are satisfactory and that we aré to pay you $5,000 cash at the time of transfer in addition to the timber land. * * *
“In making this trade oh section seventeen, we are compelled to take the northwest quarter ourselves and take our chances on selling it a little later on. ’ ’
This telegram and letter shows no acceptance of the terms of the contract sued upon, .as modified or otherwise. The trade for Arkansas land and the prices named are entirely foreign to any of the terms of the contract alleged. This correspondence further shows that plaintiffs were not then acting under any such contract as the one alleged, but upon some kind of negotiations subsequent thereto.
*402 The evidence of plaintiffs, however, discloses that Mr. Godfrey, representing defendant, came ont to Monte Vista pursuant to the telegram and letter, hut refused to take the Arkansas land in trade, because of a defect in the title, and, thereupon, plaintiffs both testify to negotiations with Godfrey to the effect that plaintiffs would buy all of said section seventeen themselves, except what they had succeeded in selling to some Nebraska parties, and pay one-fourth cash and balance in four equal payments in one, two, three and four years. This was foreign to any contract made prior to that time, and plaintiffs do not testify that such negotiations were made as a modification of any prior contract, although the contract described in the complaint was made a month before that time. Mr. Baum does testify as follows:
“We said to Mr. Godfrey we were willing to complete this deal along the lines of the contract, that as he had agreed, with the exceptions that we should pay him more money than what the option called for in the beginning, provided that he would accept these mortgages back from these other parties in Nebraska to whom we had already sold certain parts of this land and received the money and had it deposited in the bank at Tecumseh, Nebraska; to which he agreed. * * * We told Mr. Godfrey we would make these payments in one, two, three and four years, and he agreed to it.
“I told Mr. Godfrey (defendant’s representative) that we had sold these parcels of this Section 17 and it was necessary to continue with it to complete this deal we were making on the entire section. I showed him the contract — Mr. Godfrey said that he would write a contract of sale covering this section 17 under the terms of the contract, $24, and accordingly he offered to close this deal on the lines of the contract, $24, and accordingly I was surprised that he went away without writing the contract which he had agreed to write. After he knew of the *403 sale of the three eighties he agreed to write a contract for section 17 all of it at $24 an acre, $25, they would allow us $1 an acre commission and all over that we received. The terms was to have been one-fourth and the balance in one, two, three and four years.”
Mr. Dowdell, the other plaintiff, testifies.
“In order to clear up the title to section 17; or timber land in Arkansas, Mr. Godfrey agreed to accept a note without interest. After that contract was written I submitted it to Mr. Godfrey. * * * Mr. Godfrey proposed that we take section 17 at $24 per acre, 25 per cent cash, 25 per cent in one year, 25 per cent in two years, three years and four years. We told him we would accept it; it was perfectly acceptable to Mr. Godfrey and he further said that he would have a contract written. The next day he did not have it written, claiming that Mr. Stephenson was busy.
“I did not see anything more of him until Sunday, when he was about to take the train leaving Monte Vista. Mr. Baum and I urged him to prepare the contract on section 17 at $24 an acre; 25.per cent cash and the balance in four equal payments at 6 per cent, which he said he would do as quick as he got home, but he never done it. * * *
“We exhibited contracts to Mr. Godfrey that we had made with the Nebraska people and explained to him the dates of the payments and about the money advanced in the bank and he accepted the $1,100 that was deposited there and it was satisfactory to him.”
These negotiations were in the latter part of November, 1909. Soon thereafter, plaintiffs sent to defendant a contract purporting to comprise these negotiations with Godfrey, which required defendant to accept a mortgage on only a part of the land for the balance of the purchase price; and Mr. Dowdell testified that this was according to the negotiations aforesaid. Defendant refused to sign *404 it, and on December 27, 1909, notified plaintiffs that the land was withdrawn from the market.
Plaintiffs rely upon these negotiations with Mr. Godfrey as the basis for the modifications of the original contract1 alleged in the complaint. These negotiations were in the nature of a new agreement, on the part of plaintiffs, to buy part of the land themselves, and sell the rest of it to Nebraska parties. Anyway, the negotiations resulted in nothing more than Mr. Godfrey’s agreeing to draw up a written contract concerning the deal, which he did not do, together with defendant’s later refusal to sign one prepared by plaintiffs; and the contract prepared by plaintiffs and sent to defendant was not according to the modifications alleged.
Plaintiffs, afterwards, however, in January, 1910, did go to Indiana and tender to defendant one-fourth of the full price of the entire section seventeen, together with notes and mortgages for the balance, according to the modifications of the contract as alleged in the complaint; but this was rejected, and it was made after the land was withdrawn from the market, and, furthermore, not in accordance with any subsequent modifications, nor with any agreement established by the testimony.
It is firmly settled law that assent and acceptance, in instances such as this, must not vary or depart from the terms of the option, either in words or effect, nor amount to a substitute or counter-proposition.
“In these cases there is no assent, and no contract. The respondent is at liberty to accept wholly; or to reject wholly ;• but one of these things he must do; for if he answers, not rejecting, but proposing to accept under some modifications, this is a rejection of the offer. The party making the offer may renew it; but the party receiving it cannot reply, accepting with modifications, and when these are rejected, again reply, accepting generally, and upon this acceptance claim the' right of holding the other *405 party to Ms first offer.” — 1 Parsons on Contracts, p. 516, *p. 477 (9th ed.).
This rale is distinctly affirmed and illustrated in Salomon v. Webster, 4 Colo., 353; Davis v. Thomas, 28 Colo., 303, 64 Pac., 187; Talcott v. Mastin, 20 Colo. App., 488, 79 Pac., 973.
If the last acceptance and tender made by plaintiffs had been in exact accordance with the terms of the alleged contract and modification, it comes precisely within the acceptance defined in the foregoing quotation from Parsons, supra, because it was made after -propositions and counter-propositions had been made with no result, and then came as a general acceptance of the modified contract sued upon, after the property had been withdrawn from the market as provided in the original contract.
“In order that an acceptance may be operative, it must be plain, unequivocal, unconditional, and without variance of any sort between it and the proposal, and it must be communicated to the other party, and that without unreasonable delay.’’ — Pry on Specific Performance, sec. 284.
The same author, in sec. 289, says the introduction of a term in the acceptance which is not in the proposal is a variance which prevents their constituting a contract.
The original contract, without modification, was without consideration, and the modification alleged was never proved, because the acceptance first made was not in conformity with the modification alleged, and the acceptance and tender last made was not pursuant to any completed agreement, was rejected, and came after the property was withdrawn from the market as provided in the contract, whereby both parties were released from further obligations by the terms thereof.

Judgment Affirmed.